**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BLAIR JONES, | : | **Hon. Noel L. Hillman** |
| Plaintiff, | : | Civil No. 10-0297 (NLH) |
| v. | : | |
| BUREAU OF PRISONS, et al., | : | **OPINION** |
| Defendants. | : | |

It appearing that:

1. Blair Jones, who is currently incarcerated at FCI Fort Dix, filed a Complaint (Docket Entry #1) against the Bureau of Prisons ("BOP") and several medical and non-medical officials.

2. On August 12, 2010, this Court dismissed the Complaint without prejudice to the filing of an amended complaint stating an Eighth Amendment medical care claim. (Dkt. 7, 8.) This Court found that, while Plaintiff's allegations showed that he had a serious medical need concerning his neck and back, his allegations did not show that defendants were deliberately indifferent to his medical needs.

3. On September 9, 2010, Plaintiff filed an Amended Complaint, and on November 3, 2010, he filed a memorandum of law in support of the Amended Complaint. (Dkt. 9, 14.)

4. In the Amended Complaint, Plaintiff essentially repeats the allegations in the Complaint and he expresses his

disagreement with this Court's ruling.  He alleges the following additional facts:

> Doctor Anthony A. Chiuro recommended that Plaintiff be operated on to relieve his pain and suffering after Dr. Chiuro had "read" Plaintiff's MRI on or about July 27, 2010. In fact Dr. Chiuro ordered a myelography be performed on Plaintiff which shows that there is a disk osteophyte complex encroaching on the ventral subarachnoid space causing encroachment on the ventral surface of the spinal cord at C4-C5 . . . .
>
> Plaintiff has suffered for years now with severe neck and back pain that could/should be relieved through surgery that has been, and continues to be withheld by the very same people that the Court has entrusted Plaintiff to . . .
>
> As previously stated, a neuro-surgeon has evaluated Plaintiff's MRI and determined that Plaintiff needs surgery to correct the disks in his neck, and the myelography confirmed this diagnosis.
>
> The defendants made a concerted effort to prevent Plaintiff from consulting with a neuro-surgeon for some five years, and not until Plaintiff filed his Civil Action did the defendants allow Plaintiff to consult with a neuro-surgeon, and the determination by the neuro-surgeon proves beyond a shadow of a doubt that the "prison officials" 'conclusion' was wrong, and they knew it was wrong all along.
>
> The Regional Director's (defendant [D]odrill) decision denying Plaintiff's appeal states that prison officials determined that an evaluation by a neuro-surgeon is not clinically indicated.  He is merely 'parroting' what the prison officials said, showing that he is blatantly indifferent to Plaintiff's medical condition.  His was yet another unqualified opinion.

> The defendants are obligated to make sure Plaintiff is provided with the proper medical care. Plaintiff has been suffering since before his arrest, and he knew that he would have to have surgery to correct the disks in his back. He has been signing up for sick call and telling the doctors and physician assistants for years that he is in severe pain, and all the defendants did was prescribe pain medications for Plaintiff to mask the problem. All the pain pills do is take the edge off. The Defendants know that pain pills will not 'cure what ails you.' They have been 'slow walking' Plaintiff for years because they know that it will take corrective surgery to stop the pain . . . and they're trying to save the BOP a few bucks by letting plaintiff suffer . . . . If they were any kind of doctors at all they should be able to make an educated guess as to why Plaintiff is in such severe pain . . . . Although the defendant doctors are not neuro-surgeons, they should be able to 'read' an MRI to some degree, if they are any kind of doctor at all. And they know that the next logical step is to have a neuro-surgeon 'read' it because he is an expert at reading MRI's, and yet the defendants (all of them) made no effort to allow Plaintiff to have a consultation with a neuro-surgeon until Plaintiff filed his civil action. Now the defendants have all of a sudden changed their minds? . . . . This is gross negligence . . . .
>
> Defendant [D]odrill (regional director) didn't even bother to look into Plaintiff's medical file and/or get a second opinion as to whether Plaintiff should be allowed to consult with a neuro-surgeon. All he did was parrot what the other defendants said, and he would have denied Plaintiff's request for the renewal of his "First Floor Pass" in the blink of an eye.
>
> As it turned out, the defendants saw their way clear to renew Plaintiff's first floor pass . . . so Plaintiff doesn't have to risk

> life and limb ascending/descending
> staircases.

(Dkt. 9 at 2-9.)

    5.   Plaintiff sets forth more facts in his Memorandum of Law in Support of the Amended Complaint.  (Dkt. 14.)  He alleges that "the defendants' failure to treat [his medical needs] resulted in further injury coupled with the wanton infliction of pain when he collapsed and injured himself on February 6, 2010."  (Id. at 3.)  Three exhibits are attached to the Memorandum of Law:  letter dated September 28, 2004, from Robert Baraff, M.D.; signed consent form for surgical procedure dated July 20, 2010; and assessment dated February 6, 2010, regarding facial injuries Plaintiff sustained in a fall.  (Id. at 5-8.)

    6.   The September 28, 2004, letter is from neurologist Robert Baraff, M.D., to Alan Cappellini, D.C., and describes the outcome of Dr. Baraff's neurological evaluation of Plaintiff on September 28, 2004.  The letter states:

> On 7/16/2003 he had an increase in his lumbar
> discomfort while loading a garbage can of
> grass onto a truck [while working as a truck
> driver loader/unloader.]  His legs were numb
> and gave out.  He fell into the truck and
> injured his cervical area as well as his left
> shoulder area.  He saw the Worker's
> Compensation physician who kept him off of
> work for three days.  X rays were obtained
> and he was referred to Dr. Astana for a
> neurologic evaluation.  A cervical MRI scan
> revealed some bulging discs . . . .  The scan
> was dated 10/7/2003 . . . .  He has not
> returned to work since 2003.  He continues to
> have cervical discomfort radiating into his

> arms associated with numbness in his hands. His neck pain is worse with cervical range of motion and use of his arms. Because of the pain, he has had several syncopal episodes associated with a light-headed feeling. His pain is constant. He received conservative therapy under your care once every two weeks . . . .
>
> IMPRESSION:   (1) Cervical strain with cervical radiculopathy, 7/16/2003.
>
> COMMENT: This patient has residual signs and symptoms related to his injury at work on 7/16/2003. In my opinion, he should see a neurosurgeon as soon as possible. Further chiropractic care is indicated. Should his condition deteriorate, then hospitalization may be required. His past records have been reviewed. We have discussed the fact that he appears to have some spinal cord compromise on his scan and that deterioration in his condition from even a minor injury could cause quadriparesis, paraplegia, loss of bowel and bladder, etc. I shall prescribe Depakote . . . . I shall re-evaluate him in several weeks.

(Dkt. 14 at 5-6.)

    7.    The February 6, 2010, assessment by provider Aimee Ackley, NREMT-P, states:

> Called to 58-02 for an inmate that has facial injuries he sustained form a fall . . . . The patient was sitting in a chair . . . . He states he remembers getting up to walk to the bathroom and the next thi[ng] was everyone standing over him. The other inmates in the room state that he stood up and his legs gave out and he fell onto the table.
>
> PE: Rt side facial injuries: Bruising to the rt eye, upper and lower lids, small 1 cm laceration in the corner of the rt eye, no active bleeding . . . . The on call MD was

> notified as a precaution and advised to place
> the inmate on sick call for follow-up blood
> pressure monitoring.  He is given ice and
> instructions, a steri-strip is placed on the
> laceration to prevent further bleeding and
> the patient is returned to his unit w/o
> incident.

(Dkt. 14 at 8.)

8.  "To show deliberate indifference, a plaintiff must do more than simply allege medical malpractice or express disagreement regarding the treatment provided."  Watkins v. Cape May County Correc. Center (Medical Dept.), 240 Fed. App'x 985, 986 (3d Cir. 2007) (citing Monmouth County Corr. Inst. Inmates, 834 F. 2d at 346).  As the Supreme Court explained:

> [T]he question whether an X-ray or additional
> diagnostic techniques or forms of treatment
> is indicated is a classic example of a matter
> for medical judgment. A medical decision not
> to order an X-ray, or like measures, does not
> represent cruel and unusual punishment. At
> most it is medical malpractice . . .

Estelle, 429 U.S. at 107.

9.  Moreover, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  Spruill v. Gillis, 372 F. 3d 218, 236 (3d Cir. 2004).

10.  In this case, Plaintiff's medical care claim fails because the facts alleged in the Complaint, supplemented by the

facts alleged in the Amended Complaint and Memorandum of Law, do not show that the medical defendants knew that they were providing inadequate medical care and intentionally ignored Plaintiff's need for medical care different from what was being provided.  At best, Plaintiff's allegations, as supplemented by the Amended Complaint, indicate that the medical defendants were negligent.  "When a prisoner receives medical treatment and disputes the adequacy of that treatment, [federal courts] are reluctant to second guess the doctor's medical judgment. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir.2004).  Mere disagreements between the prisoner and the treating physician over medical treatment do not rise to the level of 'deliberate indifference.' See Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.1987)." Quinn v. Dietman, 413 Fed. App'x 419, 422 (3d Cir. 2011). Moreover, because Plaintiff's allegations do not show that the non-medical defendants had reason to believe that prison doctors were mistreating Plaintiff or denying medical care, the Amended Complaint does not show that the non-medical defendants were deliberately indifferent.  See Spruill, 372 F. 3d at 236.  Under these circumstances, this Court will dismiss Plaintiff's Eighth Amendment medical care claim in the Amended Complaint for failure to state a claim upon which relief can be granted.

    11.  This Court further construes Plaintiff's allegations as seeking reconsideration of this Court's dismissal of the failure

to protect claim (alleging failure to renew first floor pass) for failure to exhaust administrative remedies. As quoted above, Plaintiff believes that exhaustion would be futile because he thinks officials would have ultimately denied his request to renew the pass. However, Plaintiff asserts that officials at FCI Fort Dix did renew his first floor pass. After reconsideration, this Court will again dismiss Plaintiff's failure to protect claim for failure to exhaust administrative remedies, as Plaintiff has not shown that seeking administrative relief would be (or was) futile.

12. This Court will dismiss the Amended Complaint for failure to state a claim upon which relief may be granted. This Court thoroughly explained the law to Plaintiff in dismissing the original Complaint. Plaintiff's attempt to cure the defects in the Complaint by supplementing the Complaint failed to establish deliberate indifference. This Court finds that further attempts to amend would be futile.

13. An appropriate Order accompanies this Memorandum Opinion.

/s/ Noel L. Hillman
**NOEL L. HILLMAN, U.S.D.J.**

Dated:  August 9 , 2011

At Camden, New Jersey